**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

JOHN E. FERGUSON,

   Plaintiff,

 v.         Civil Action 2:18-cv-1024
             Judge George C. Smith
             Magistrate Judge Jolson

COMMISIONER OF
SOCIAL SECURITY,

   Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, John E. Ferguson, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 9) be **OVERRULED** and that judgment be entered in favor of Defendant.

**I. BACKGROUND**

Plaintiff filed his application for SSI on June 15, 2015, alleging that he was disabled beginning June 1, 2009. (Doc. 8, Tr. 260–65). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held the hearing on September 13, 2017. (Tr. 43–117). On January 25, 2018, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 12–36). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on September 10, 2018 (Doc. 1), and the Commissioner filed the administrative record on November 26, 2018 (Doc. 8). Plaintiff filed his Statement of Errors (Doc. 9) on January 10, 2019, Defendant

filed an Opposition (Doc. 10) on February 24, 2019, and Plaintiff filed his Reply (Doc. 11) on March 11, 2019. Thus, this matter is now ripe for consideration.

    **A.**    **Relevant Medical History and Hearing Testimony**

The ALJ usefully summarized Plaintiff's medical records:

> . . . As for the claimant's diabetes with neuropathy, his hemoglobin A1c was often normal. (Exhibit B7F, page 6; Exhibit B20F, page 2; Exhibit B22F, pages 15, 30). His blood sugar levels were often elevated. (Exhibit B18F, page 13; Exhibit B20F, page 9). He would not check his blood sugars at home. (Exhibit B22F, page 15).
>
> In June 2015, he reported having tingling and numbness in his hands and feet. He reported burning in the soles of his feet, toes, and occasionally outside his fourth and fifth fingers. He denied any weakness. (Exhibit B6F, page 1). It was noted this neuropathy was likely due to his diabetes. (Exhibit B6F, page 4). In July 2015, he reported the bottom of his feet were hurting. He had refused an orthopedic consultant and was non-adherent to his medications. (Exhibit B9F, page 1) . . . .
>
> In February 2016, his diabetes was well controlled with low blood sugars and good hemoglobin A1c control. . . .
>
> In February 2017, he reported his foot pain was worse since switching to Lyrica and blamed this increase in pain for his worsening mood, weight gain, and continued smoking. (Exhibit B22F, page 54). . . .
>
> \* \* \*
>
> The claimant had degenerative changes in his cervical spine. In June 2015, he reported having a habit of twisting his neck, causing it to be sore by the end of the day. He indicated he had a tendency to tip his neck with his ear to the left. He denied any shooting pan from his neck. (Exhibit B6F, page 1).
>
> \* \* \*
>
> The claimant had issues with his knees. In May 2015, he reported having pain and discomfort in both knees. A left knee arthroscopy was indicated, but the claimant wanted to hold off on doing it for a few months. (Exhibit b4F, page 2). In January 2016, he reported he was putting air in his tires every three days and it was getting difficulty [sic] to kneel and get back up due to his knee pain. (Exhibit B17F, page 7).
>
> In February 2016, he had a left knee scope with partial medical meniscectomy, chondroplasty, and bone marrow augmentation. (Exhibit B17F, pages 11-12). Two weeks later, he reported doing great and was doing very well. The surgical incision looked fine. He wanted to go ahead and schedule the right knee scope. (Exhibit B17F, page 4).

\*\*\*

In March 2017, he reported he had done better initially with his knees after surgery, but now felt his symptoms were worse, especially in the right knee whenever he bent it. (Exhibit B22F, page 72). In May 2017, he reported having a lot of problems with his right knee with swelling and pain. He indicated he would squat a lot and rest on his knees from cleaning. He indicated he would not do this often, but it would help. . . .

Imaging did not fully support the claimant's allegations. May 2015 X-rays of his right knee showed no joint effusion and a minimal irregularity of the patellar articular surface and no significant joint narrowing. May 2015 X-rays of the left knee showed minimal irregularity to the patellar articular surface and apparent unfused epiphyses or old avulsion fracture fragments anterior to the proximal tibia. The joint compartments were well maintained. (Exhibit B3F, page 2). January 2016 X-rays of the left knee showed mild changes of degenerative joint disease. (Exhibit B17F, page 8).

\*\*\*

Turning to the claimant's mental health treatment for ADHD, borderline personality disorder, dysthymic disorder, and Tourette's, . . .

In June and July 2015, he denied any memory loss, aggression, crying spells, stress, or anger. He reported depression and described having been denied disability. (Exhibit B9F, pages 1, 4).

In October 2015, the claimant reported his Cymbalta was really helping with his depression. (Exhibit B8E, page 13). In December 2015, he reported his tics had worsened since he stopped taking Topiramate and wanted to go back on them. He described his current tics as throat clearing, coughing, neck movements, and facial grimacing. (Exhibit B24F, page 3). In January 2016, he continued to deny any aggressive behavior, crying spells, memory loss, stress, or anger. (Exhibit B16F, page 18). A week later, he switched primary care doctors and reported having memory loss and depression. However, he denied any insomnia. (Exhibit B22F, page 6). He reported he worried about everything and was a mess. He claimed he did not feel much benefit from his Cymbalta, though it did help with his pain. His Cymbalta dosage was increased. He reported feeling on edge. He was not seeing a counselor and was not interested in one as he stated he hated to talk about his feelings. (Exhibit B22F, page 7). His Tourette's was mostly face and head tics with vocalizations and was stable on medication. (Exhibit B22F, page 8).

In February 2016, he reported some minor improvement with an increased dosage of Cymbalta. He still felt on edge and had changeable moods. At that time, he denied noticing any medication side effects. He was willing to consider different medication, but was still not interested in therapy. (Exhibit B22F, page 16). He was started on Wellbutrin. (Exhibit B22F, page 18). In March 2016, he was told

to stop taking Wellbutrin due to side effects with his hearing. He was started on Celexa. He reported being irritable and his girlfriend would say he was not a nice person. He was now interested in trying therapy. (Exhibit B22F, pages 23-24). He reported his Tourette's had improved since getting back on Topiramate, but his tics were still problematic. (Exhibit B24F, page 6).

In April 2016, he reported the medications were helping a little bit with his depression. (Exhibit B22F, page 26) . . .

In September 2016, he felt his mood was poor due to life stressors. He was still not seeing a counselor, but again indicated he was open to the idea now. (Exhibit B22F, page 43). . . .

In February 2017, he reported his mood had worsened since his foot pain had increased and his girlfriend thought he was very irritable. (Exhibit B22F, page 54). He was given a list of counselors and again encouraged to see one. (Exhibit B22F, page 61). In March 2017, he reported feeling pretty good. He had again not yet seen a counselor even though his doctor believed he needed help with coping mechanisms and stress management.

(Tr. 26–31).

### B. The ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful employment since June 15, 2015, the application date. (Tr. 15). The ALJ determined that Plaintiff suffered from the following severe impairments: hepatitis C, diabetes mellitus with neuropathy, gastroesophageal reflux disease, degenerative changes of the cervical spine, status-post excision of a plantar fibromatosis, chondromalacia of the bilateral needs, attention deficit hyperactivity disorder (ADHD), borderline personality disorder, dysthymic disorder, Tourette's disorder, and alcohol abuse. (Tr. 15). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 19).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally kneel, crouch, and crawl; no exposure to hazards such as heights and moving mechanical parts;

> occasional exposure to vibration; limited to simple, routine tasks with occasional interaction with supervisors and coworkers and no interaction with the general public; no strict production requirements; can adapt to occasional changes in a relatively static work setting.

(Tr. 23).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 26).

The ALJ then turned to the opinion evidence, starting with the prior ALJ's decision. (Tr. 32). The ALJ did not adopt the previous RFC because the prior ALJ's decision did "not take into account the claimant's newest medical records, which showed new severe impairments involving his mental functioning and his knees." (Tr. 32).

The ALJ next assessed the opinions of state agency psychological consultants, Dr. Swisher and Dr. Todd. (Tr. 32–33). Dr. Todd found Plaintiff could perform simple, 1–2 step tasks in a routine work setting without strict production quotas, would be able to interact with others in a work setting on a brief and superficial basis, would have difficulty dealing with stress and workplace pressures, but could adjust to occasional changes in a relatively static setting. (Tr. 179–180). Dr. Swisher found Plaintiff had the ability to perform simple tasks in a work setting without strict production quotas and could interact with peers and supervisors on a superficial work basis and to a lesser extent with the general public. (Tr. 162). The ALJ assigned these opinions "partial weight," explaining that they were "consistent with [Plaintiff's] lack of counseling and [Plaintiff's] positive response to medication" but noting that "the language used in these opinions is not entirely vocationally relevant and has been adjusted." (Tr. 33).

Next, the ALJ considered the opinion of consultative examiner, Dr. Miller. (*Id.*). Dr. Miller found that Plaintiff could understand, remember and carry out one and two step job instructions, but has some limited academic abilities. (Tr. 575). Dr. Miller also found that Plaintiff would have difficulty interacting with coworkers, supervisors and the public and difficulty staying on task. (*Id.*). The ALJ gave Dr. Miller's opinion "some weight," explaining that Dr. Miller "merely stated the claimant would have difficulty keeping his mind on task or with interacting with others, but did not state what degree the claimant could focus or what degree he could interact with others." (Tr. 33).

Finally, the ALJ assessed the opinion of physical therapist Mary Margaret Boyd with WorkWell Systems, Inc. (Tr. 33). Ms. Boyd completed a functional capacity evaluation in August 2017. (Tr. 829–39). In evaluating her opinion, the ALJ first noted that Ms. Boyd is an "other source" and then went on to assign her opinion "partial weight," explaining that Plaintiff's performance on the second day of testing was "reduced and self-limited compared to the first" and that Plaintiff's self-limited performance was the basis for Ms. Boyd's opinion. (Tr. 33).

In conclusion, the ALJ provided the following explanation of his ultimate RFC determination:

> In sum, the above residual functional capacity assessment is supported by the conservative treatment history, the longitudinal medical record, the claimant's conditions being well controlled by medication, the claimant's statements, the opinion of the consultative examiner and the functional capacity evaluation, and the claimant's presentation on examination. The claimant's allegations are not entirely consistent with the evidence. He had some non-adherence to medications and treatment. (Exhibit B9F, page 1; Exhibit B16F, pages 4, 10, 12). He would not use a CPAP machine for his sleep apnea. He never saw a counselor for his mental health. He did not follow up with physical therapy or do home stretching exercises for his feet. (Exhibit B22F, pages 72–73). Despite his reported social limitations and irritability, the claimant did have a girlfriend who he spent time with. (Hearing testimony; Exhibit B18F, page 25). His physical functioning was not entirely consistent with his allegations. He was able to stop [sic] down to put air into his vehicle's tires. (Exhibit B17F, page 7). He could climb two to three

flights of stairs and perform his own activities of daily living independently. (Exhibit B18F page 16). He indicated he was fired from his factory job due to his alcohol abuse, not his other impairments. (Exhibit B13F, page 2). As recently as May 2017, he reported he was walking more to get healthy and that he had no pain walking on flat ground. He reported his left knee did not really bother him unless he was squatting. (Exhibit B25F, page 2). Thus, the claimant's allegations were not entirely consistent with the evidence.

(Tr. 34).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff raises two errors to the Court. (Doc. 9). First, he argues that the ALJ's decision should be reversed because the mental RFC is not supported by substantial evidence. (*Id*. at 5). Second, he argues that the ALJ erred in his treatment of both Dr. Miller's and Ms. Boyd's opinions. (*Id*. at 9–14). The Court will address each argument in turn.

7

**A. The ALJ's RFC Finding**

In his first assigned error, Plaintiff avers that the ALJ's RFC "is materially different than the limitation opined by the state agency psychologists." (Doc. 9 at 6).

As an initial matter, the Court finds that the state agency psychologists' limitations and the ALJ's limitations are not, as Plaintiff suggests, "materially different." Plaintiff bases his argument on two subtle discrepancies between the wording of the state agency psychologists' opinions and that of the ALJ's RFC. (Doc. 9 at 6–7). First, Plaintiff alleges that the ALJ erred because one of the state agency psychologists, Dr. Todd, limited Plaintiff to simple 1–2 step tasks, whereas the ALJ limited Plaintiff to "simple routine tasks."[1] (*Id.* at 7). Second, Plaintiff contends that the ALJ erred because the state agency psychologists limited Plaintiff to only brief and superficial interaction, while the ALJ limited him to "occasional interaction with supervisors and coworkers and no interaction with the general public." (*Id.* at 7). The Court finds that the ALJ did not err in choosing not to adopt the exact limitations proposed by the state agency consultants.

Plaintiff concedes that the ALJ was not required to adopt these opinions in whole. (*Id.* at 8). However, Plaintiff claims that because the ALJ gave "partial weight" to the state agency psychologists, "the ALJ should have at least explained the rationale behind his decision and explained either why they were omitted or how they are properly accounted for in the residual functional capacity." (*Id.* at 8). However, because the state agency psychologists are not treating sources, the ALJ was not subject to the "good reasons" requirement. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

---

[1] The other state agency psychologist, Dr. Swisher, found Plaintiff retained the ability to perform simple tasks in a work setting without strict production quotas, which is the precise language the ALJ used in his RFC.

8

The Sixth Circuit's decision in *Martin v. Commissioner of Social Security* illustrates the application of this principle to facts similar to those here. 658 F. App'x 255 (6th Cir. 2016), *reh'g denied* (Sept. 20, 2016). There, the plaintiff argued "that the ALJ failed to explain why certain aspects of two opinions by non-treating sources were omitted from his RFC." *Id.* at 259. The Court explicitly rejected this argument:

> Martin protests the ALJ's lack of explanation as to why Martin's marked impairment in interacting with the general public—as found by Dr. Joslin—and his moderate to marked impairment in his ability to sustain concentration—as found by Dr. Rutledge—were not explicitly incorporated into Martin's RFC. But because Dr. Rutledge and Dr. Joslin are non-treating sources, *the reasons-giving requirement is inapplicable to their opinions*.

*Id.* (emphasis added) (citing *Reeves*, 618 F. App'x at 273; *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007)).

Plaintiff's similar argument fares no better here. As Plaintiff recognizes, the ALJ was under no obligation to adopt the state agency psychologists' opinions in full. *See Harris v. Comm'r of Soc. Sec. Admin.*, No. 1:13-CV-00260, 2014 WL 346287, at *11 (N.D. Ohio Jan. 30, 2014) ("[E]ven where an ALJ provides 'great weight' to an opinion, an ALJ is not necessarily required to adopt wholesale limitations contained therein."). Nor, as the case law above makes clear, was the ALJ required to explain why he did not adopt their opinions in full. *See, e.g.*, *Martin*, 658 F. App'x at 259. The state agency psychologists are non-treating sources, and the ALJ evaluated their opinions accordingly. As such, the ALJ did not commit reversible error when formulating his RFC.

### B. Opinion Evidence

#### i. Dr. Miller

Plaintiff next alleges that the ALJ erred with respect to his analysis of Dr. Miller's opinion. As part of his examination of the medical evidence, the ALJ parsed Dr. Miller's findings:

9

> On September 8, 2015, the claimant had a consultative psychological examination with Dr. Marc Miller. The claimant reported he was a loner. He reported having temper outbursts, withdraw [sic], and moodiness. He claimed to have had active suicidal thoughts in the past and current passive suicidal thoughts. He reported he had not had formal mental health treatment and was not taking antidepressants. He reported having poor energy and mood swings. He reported his mind raced constantly and he could not sleep. He denied having panic attacks. He reported he struggled to read a newspaper. He reported he avoided people and would stay home. He reported having no hobbies and would spend time watching television. He reported his mother performed all meals, laundry, cleaning, and shopping. (Exhibit B13F).
>
> On examination with Dr. Miller, his grooming and appearance were normal. His hygiene was intact. His gait was slow. He was restless, fidgety, and hyperactive. He was depressed and anxious. He was tearful. He had impulsive and animate behavior. He was cooperative. He had facial tics and would often blow from his mouth. His attention span and concentration were impaired. His eye contact was good. He had no hand tremors. His speech was normal. He had no looseness of thought or tangential thinking. His receptive language skills were good. He reported having word finding difficulty, though this was not observed during the interview. He reported passive suicidal thoughts. He was alert and oriented. He recalled two of three items after five minutes. He could recall biographical information, but had short-term memory and word-finding problems. He had moderate problem solving and organization abilities. He could not spell "world" backwards. He could interpret basic proverbs. His abstract thinking was poor. He could follow one-step directions, but could not multitask due to hyperactivity. He knew who the president was, but not the governor. He was estimated to have borderline intelligence. He had no hallucinations, obsessions, or compulsions. He had poor coping skills and became overwhelmed easily. He had low self-esteem. His insight and judgment were moderate. (Exhibit B13F).

(Tr. 31–32). The ALJ assigned Dr. Miller's opinion "some weight." (Tr. 33). The ALJ elaborated on his decision to do so:

> [Dr. Miller] found the claimant could understand, remember, and carry out one and two step job instructions, but did have limited academic abilities. He found the claimant had difficulty interacting with coworkers, supervisors, and the public. He found the claimant had difficulty keeping his mind on task, noting his ADHD. He found the claimant had difficulty dealing with stress and pressure in a work setting. (Exhibit B13F, page 4). Dr. Miller does not provide concrete limitations and mainly just reported the claimant's difficulties based on his own self-reporting. Dr. Miller merely stated that the claimant would have difficulty with keeping his mind on task or with interacting with others, but did not state what degree the claimant could focus or what degree he could interact with others. Thus, this opinion is given only some weight.

(Tr. 33).

Plaintiff argues that Dr. Miller's findings "deserved more than to simply be blown off by the ALJ with rationale that is not supported by the evidentiary record." (Doc. 9 at 11). But Plaintiff demands more than the Regulations require. As already established, there is no "reasons-giving" requirement with regard to non-treating sources. *See Martin*, 658 F. App'x at 259. Rather, an ALJ "'must say enough to allow the appellate court to trace the path of his reasoning.'" *Pinson v. Comm'r of Soc. Sec.*, No. 3:18CV12, 2019 WL 969484, at *9 (N.D. Ohio Feb. 28, 2019) (quoting *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011)). The ALJ in this case more than satisfied that standard.

After providing a comprehensive summary of Dr. Miller's findings, the ALJ concluded that Dr. Miller provided only a vague explanation for his limitations and, moreover, relied primarily on Plaintiff's subjective statements. (Tr. 33). Accordingly, the ALJ, in his discretion, appropriately assigned only "some weight" to Dr. Miller's opinion. (*Id*.). Indeed, despite Plaintiff's protests otherwise, it was proper for the ALJ to consider the quality and basis of the source's opinion. *See, e.g.*, *Pinson*, 2019 WL 969484, at *9 (finding that the ALJ did not err in assigning "some weight" to consultative examiner's opinion "due to the vague nature of the opinion statement" and the fact that the examiner "did not offer any functional limitations which could be incorporated into an RFC by the ALJ.") (citing *Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 476 (6th Cir. 2008) (finding that ALJ properly rejected portions of a non-treating physician's opinion he found "vague and not defined"). Accordingly, the ALJ properly concluded that Dr. Miller did not provide concrete limitations suitable to incorporate into an RFC and based his opinion on Plaintiff's subjective statements. As such, Plaintiff has shown no reversible error in this respect.

*ii. Margaret Boyd*

Next, Plaintiff alleges that the ALJ erred in his evaluation of physical therapist Margaret Boyd's functional capacity evaluation. (Doc. 9 at 12–14). The ALJ had the following to say about Ms. Boyd's opinion:

> The undersigned has considered the opinion of Mary Margaret Boyd with WorkWell as an "other source" opinion pursuant to 20 CFR 404.1527 and 416.927 and gives this opinion partial weight. She completed a functional capacity evaluation in August 2017 over a two-day period. The claimant reported pain in his low back, knees, right shoulder, and intermittently in his left shoulder and foot. Ms. Boyd noted the claimant could frequently sit and had no significant limitations to range of the distal extremities. She did not notice reduced response to light touch or balance. His fine motor and left gross hand coordination were normal. It was noted he was not consistent with complaints of pain in his right elbow. Overall, she found he could frequently walk and sit. She noted he self-limited to lifting five to ten pounds waist to floor, three to five from waist to head, and ten pounds in a front carry. She noted he could occasionally reach, crouch, and kneel. She found he could frequently climb stair [sic], walk, sit, and stand. The undersigned notes that during this testing, the claimant self-limited himself with lifting and carrying objects on the second day. His performance in the second day of testing was reduced and self-limited compared to the first. (Exhibit B26F). Her opinion is based on the testing of the claimant, which was self-limited. Thus, this opinion is given partial weight.

(Tr. 33).

As Plaintiff concedes, Ms. Boyd is not an acceptable medical source. (Doc. 9 at 12). Only an "acceptable medical source" can give a medical opinion. SSR 06-03p, 2006 WL 2329939, at *2.[2] Because a physical therapist is not considered an "acceptable medical source" under the regulations, 20 C.F.R. § 404.1527(f)(2); SSR 06-03p, 2006 WL 2329939, at *2, an ALJ is not required to give any special deference to a physical therapist's report. *See, e.g.*, *Nierzwick v. Comm'r of Soc. Sec*, 7 F. App'x 358, 363 (6th Cir. 2001) (physical therapist's report not afforded significant weight because therapist not recognized as an acceptable medical source); *Fithen v.*

---

[2] This regulation has been rescinded. It still applies, however, to claims (like this one) filed before March 27, 2017. 20 CFR § 404.1527.

12

*Comm'r of Soc. Sec.*, No. 1:15-cv-213, 2016 WL 1381822, at *10 (S.D. Ohio Apr. 6, 2016) ("Thus, the ALJ was not required to give any special deference or weight to Ms. Dorma's FCE."), *report and recommendation adopted*, No. 1:15CV213, 2016 WL 2731683 (S.D. Ohio May 10, 2016); *Bruce v. Comm'r of Soc. Sec.*, No. 1:08-cv-328, 2009 WL 239023, at *10 (S.D. Ohio Jan. 29, 2009) ("Moreover, the ALJ was not required to give any special deference to the therapist's functional capacity evaluation because therapists are not considered acceptable medical sources under the Social Security regulations."). The ALJ nonetheless fully evaluated Ms. Boyd's functional capacity evaluation and gave it "some weight" for reasons he discussed in his written decision. (Tr. 33).

Plaintiff alleges that "the ALJ attempted to find some loophole that he could exploit in order to bury Ms. Boyd's unwanted clinical findings." (Doc. 9 at 13). He also contends that "[t]he ALJ took the note that Mr. Ferguson 'self-limited' and apparently interpreted that as some form of lesser effort or deceit on the part of Mr. Ferguson." (*Id.*). The Court finds Plaintiff's statements to be a mischaracterization of the ALJ's decision. Indeed, a more reasonable interpretation of the ALJ's decision is that, because Plaintiff "self-limited" on the second day of his evaluation, the results of that evaluation, as well as Ms. Boyd's opinion based on those results, are not entirely accurate. It is not as if, for example, the ALJ wholly rejected the opinion based on Plaintiff's performance at the evaluation. Rather, the ALJ, under no obligation to afford any special deference to an unacceptable medical source, thoroughly reviewed Ms. Boyd's findings and reached a logical and supportable conclusion regarding her opinion. Plaintiff has shown no error in this regard.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 9) be **OVERRULED** and that judgment be entered in favor of Defendant.

13

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date: June 7, 2019 /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE